UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIO LLANES TELLEZ,<br><br>    Plaintiff,<br><br>v.<br><br>PAM BONDI, et al.,<br><br>    Defendants. | Case No. 25-cv-08982-PCP<br><br>**ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS** |

On October 17, 2025, Julio Llanes Tellez was seized by U.S. Immigration and Customs Enforcement (ICE), a division of the Department of Homeland Security (DHS), at a scheduled check-in at ICE's field office at 630 Sansome Street in San Francisco, California. Mr. Llanes Tellez is an applicant for asylum who has lived and worked in the United States since 2022. Mr. Llanes Tellez filed a petition for a writ of habeas corpus, arguing that his detention violated his rights, including his right to procedural due process. For the following reasons, the petition for a writ of habeas corpus is granted.

## STATUTORY FRAMEWORK

Two statutes, 8 U.S.C. §§ 1225 and 1226, provide for the detention of noncitizens or "aliens" pending removal proceedings. Under § 1225, a noncitizen "who 'arrives in the United States,' or 'is present' in this country but 'has not been admitted,' is treated as 'an applicant for admission.'" *Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018) (quoting 8 U.S.C. § 1225(a)(1)). All noncitizens "who are applicants for admission" or who are "otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers" to assess whether they may be admitted into the country. 8 U.S.C. § 1225(a)(3). An inspecting officer must then determine whether an applicant for admission is covered by either § 1225(b)(1) or § 1225(b)(2). *See Jennings*, 583 U.S. at 287. Section 1225(b)(1) applies to noncitizens who,

upon arriving, are initially deemed inadmissible under 8 U.S.C. § 1182(a)(6)(C) or (a)(7) due to fraud, misrepresentation, or lack of valid documentation. *See* 8 U.S.C. § 1225(b)(1)(A)(i). It also applies to certain noncitizens designated by the Secretary of Homeland Security who are later determined to be inadmissible under § 1182(a)(6)(C) or (a)(7) and were not continuously present in the United States for the two-year period prior to that determination. *See* 8 U.S.C. § 1225(b)(1)(A)(iii).[1] Section 1225(b)(2) covers all other "applicant[s] for admission" who are "seeking admission," with limited exceptions not applicable here. *See* 8 U.S.C. § 1225(b)(2)(A)–(B).

Subsections (b)(1) and (b)(2) of 8 U.S.C. § 1225 both authorize detention pending removal proceedings in certain circumstances. Noncitizens covered by § 1225(b)(1) are subject to an expedited removal process and will be "removed from the United States without further hearing or review" unless they claim a right to asylum. 8 U.S.C. § 1225(b)(1)(A)(i)–(ii). If a noncitizen states an intent to apply for asylum and an immigration officer determines that there is a credible fear or persecution, the noncitizen "shall be detained for further consideration of the application for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii).

Noncitizens covered by § 1225(b)(2) are not subject to expedited removal. Instead, they are placed in standard removal proceedings under § 1229a, which include an evidentiary hearing before an immigration judge, the right to counsel, and the risk to seek review by the Board of Immigration Appeals (BIA) and a federal court of appeals. 8 U.S.C. § 1225(b)(2)(A); *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 108 (2020); *see also Valencia Zapata v. Kaiser*, No. 25-cv-07492-RFL, 2025 WL 2741654, at *1 (N.D. Cal. Sept. 26, 2025). Section 1225(b)(2) mandates that noncitizens "shall be detained" pending such proceedings unless they are "clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A). "In other words, noncitizens subject to 1225(b)(2) are not eligible for expedited removal but are subject to mandatory detention while their full removal proceedings are pending." *Salcedo Aceros v. Kaiser*,

---

[1] The authority to designate groups of noncitizens for expedited removal "once belonged to the Attorney General, who is still named in the statute," but has since been transferred to the Secretary of Homeland Security. *See Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 109 n.3 (2020) (citing 6 U.S.C. § 251(2)).

2

No. 25-cv-06924-EMC, 2025 WL 2637503, at *3 (N.D. Cal. Sept. 12, 2025). The government may release noncitizens detained under either § 1225(b)(1) or (b)(2) only on temporary parole "for urgent humanitarian reasons or significant public benefit." *Jennings*, 583 U.S. at 300; *see* 8 U.S.C. § 1182(d)(5)(A). By regulation, release is available only where "the aliens present neither a security risk nor a risk of absconding." 8 C.F.R. § 212.5(b).

For noncitizens who are "already in the country," § 1226 permits detention "pending the outcome of removal proceedings" in certain circumstances. *Jennings*, 583 U.S. at 289. Unlike § 1225(b)(1) and (b)(2), § 1226 affords the government significant discretion. After arresting a noncitizen "[o]n a warrant issued by the Attorney General," the government "may continue to detain the arreste[e]" until a final removal decision is made or "may release" them on "bond" or "conditional parole." 8 U.S.C. § 1226(a)(1)–(2). As under § 1225(b)(1) and (b)(2), however, release is available only if "the alien … demonstrate[s] to the satisfaction of [an] officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." 8 C.F.R. §§ 236.1(c)(8), 1236.1(c)(8). If a noncitizen wishes to contest the initial custody determination—i.e. the denial or amount of bond—he has a right to do so before an immigration judge. 8 C.F.R. §§ 236.1(d)(1), 1236.1(d)(1). Immigration judges must deny bond unless "an alien … demonstrate[s], by clear and convincing evidence, that release would not pose a danger to other persons or to property" and "that the alien is likely to appear for any scheduled proceeding or interview." 8 C.F.R. § 1003.19(h)(3). Just as § 1226(a) grants DHS discretion to release covered noncitizens, § 1226(b) permits DHS to revoke bond or parole "at any time." 8 U.S.C. § 1226(b).

In a handful of circumstances, § 1226(c) departs from § 1226(a)'s discretionary framework to mandate detention of noncitizens who are already in the country. *See* 8 U.S.C. § 1226(c). The government "shall take into custody" noncitizens who are inadmissible or deportable because they have committed certain criminal offenses, 8 U.S.C. § 1226(c)(1)(A)–(C); are inadmissible based on terrorist affiliations or other security concerns, 8 U.S.C. § 1226(c)(1)(D); or are inadmissible on certain bases and have been charged, arrested, or convicted for specific crimes not including driving under the influence, 8 U.S.C. § 1226(c)(E). *See also Murillo-Salmeron*, 327 F.3d 898, 902

1 (9th Cir. 2003) ("The BIA has unequivocally determined … that simple DUI convictions, even if

2 repeated, are not crimes of moral turpitude" subjecting noncitizens to mandatory detention under 8

3 U.S.C. § 1226(c)(1)(A)) (citing *In re Torres-Varela*, 23 I. & N. Dec. 78 (BIA 2001) (en banc));

4 *see also Marmolejo-Campos v. Holder*, 558 F.3d 903, 913 (9th Cir. 2009) (en banc) ("The BIA

5 has never held that a simple DUI offense is a crime involving moral turpitude …."). Section

6 1226(c) authorizes release of such noncitizens only if the government deems it necessary for

7 witness-protection purposes and finds that the alien will not pose a danger to the safety of other

8 persons or of property and is likely to appear for any scheduled proceeding." *See* 8 U.S.C.

9 § 1226(c)(4).

## FACTUAL BACKGROUND

11  Mr. Llanes Tellez is a 43-year-old man from Nicaragua. In February 2022, he entered the

12 United States at San Luis, Arizona. Dkt. 6-1 at *15. A Customs and Border Patrol agent

13 apprehended him. Respondents' Return at 1, Dkt. 5. The government thereafter released Mr.

14 Llanes Tellez on an Order of Release on Recognizance. Dkt. 6-1, Exh. B, at *10.  That order

15 explained to Mr. Llanes Tellez that he was being released in "accordance with section 236 of the

16 Immigration and Nationality Act and the applicable provisions of Title 8 of the Code of Federal

17 Regulations." Dkt 6-1, Exh. B. Section 236 of the Immigration and Nationality Act corresponds to

18 8 U.S.C. § 1226. *See* Immigration and Nationality Act, U.S. Citizenship & Immigration Services,

19 https://www.uscis.gov/laws-and-policy/legislation/immigration-and-nationality-act. As mentioned

20 above, § 1226 prohibits the release of a detained noncitizen unless the noncitizen "satisfie[s] [the

21 government] that [he] will not pose a danger to the safety of other persons or of property and is

22 likely to appear for any scheduled proceeding." 8 U.S.C. § 1226(a)(4); *see also* 8 C.F.R.

23 § 1236.1(c)(8). The government conditioned Mr. Llanes Tellez's release on, among other

24 requirements, not violating any laws and reporting to a duty officer in San Francisco, California as

25 instructed.[2] In November 2022, Mr. Llanes Tellez filed an application for asylum and received his

---

[2] The Order of Release that has been provided to the Court also includes as a condition that Mr. Llanes Tellez "register in a substance abuse program within 14 days and provide ICE with written proof of such within 30 days." Dkt. 6-1, Exh. B, at *12. The government has neither suggested

4

work authorization. Petition at 2; Dkt. 6-1, at 3 & Exh. C.

Since his release, Mr. Llanes Tellez has worked as an agricultural worker in Hollister, California. Petition for Writ of Habeas Corpus, Dkt. 1, at 2. When he arrived in Hollister, he rented a room in a house and helped care for the terminally ill landlord and do household chores. Dkt. 6-1, Exh. D. He lives in the same house as two elderly women who have "peace of mind" knowing that they can rely on him for help. A neighbor describes Mr. Llanes Tellez as "a hard-working, law-abiding generous individual" who "works six days a week at a farm here in Hollister." Dkt. 6-1, Exh. D. Besides helping care for elderly members of the Hollister community, Mr. Llanes Tellez sends money home to his children and sick mother in Nicaragua. Dkt. 6-1, Exh. D.

On December 2, 2023, Mr. Llanes Tellez was arrested for driving under the influence of alcohol. Return at 2; Dkt. 5-5, Exh. B, at *5. Following his arrest, Mr. Llanes Tellez completed a "three-month first offender dui counseling program that has assisted him in navigating ills of alcohol." Traverse at 2. On August 29, 2024, after successfully completing his substance abuse treatment, Mr. Llanes Tellez was convicted of driving under the influence and sentenced to ten days in jail. *Id.*

After his December 2023 arrest but before his conviction, Mr. Llanes Tellez attended a regularly scheduled check-in with ICE on April 7, 2024. Dkt. 10. ICE Deportation Officer Paul Garcia reports that ICE conducted a criminal history check on Mr. Llanes Tellez at that time but did not learn of his arrest. Dkt. 10. On February 15, 2025, Mr. Llanes Tellez once again reported to ICE (via email). Dkt. 10. On February 17, 2025, ICE ran another criminal history check and learned of Mr. Llanes Tellez's DUI arrest.[3]

---

that this is a standard condition of release imposed on all noncitizens released under § 1226 nor provided any documentation suggesting that Mr. Llanes Tellez's circumstances at the time of his initial encounter suggested a particular need for that condition. Notably, the Order of Release includes other material that was clearly added after the initial February 2022 encounter, such as documentation of Mr. Llanes Tellez's check-ins with ICE in 2024. As a result, it is unclear from the record whether this substance abuse condition was imposed at the time of Mr. Llanes Tellez's initial release or at some later date.

[3] Although the record is unclear for the reasons noted, *supra* note 1, it would make logical sense for ICE to have added the substance abuse treatment condition of release to Mr. Llanes Tellez's

5

Eight months later, on October 17, 2025, ICE agents arrested Mr. Llanes Tellez at a scheduled check-in. They contended that he had violated the conditions of his release by violating the California state law against driving under the influence. Mr. Llanes Tellez filed his petition for writ of habeas corpus later that day. Dkt. 1. This Court issued an order to show cause under 28 U.S.C. § 2243. Dkt. 3. The United States filed a return. Dkt. 5. Mr. Llanes Tellez filed a traverse. Dkt. 7. This Court held a hearing on the order to show cause on December 2, 2025.

**ANALYSIS**

This Court must grant a writ of habeas corpus to Mr. Llanes Tellez if he "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241. Mr. Llanes Tellez contends that his ongoing detention violates his procedural due process rights under the Fifth Amendment because he was not provided with notice and an opportunity to be heard before his arrest. He additionally contends that his detention violates his Fifth Amendment substantive due process rights because the government has no valid basis for his detention. Because the procedural due process issue is dispositive, the Court need not address the substantive due process claim at this time.

The Due Process Clause protects all persons in the United States, including noncitizens, from deprivations "of life, liberty, or property" by the federal government "without due process of law[.]" U.S. Const. amend. V; *see also Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint— lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. The Supreme Court has held that noncitizens who are "on the threshold" of entering the country and "seeking initial entry" are not entitled to the full range of constitutional due process rights available under the Fifth Amendment. *Thuraissigiam*, 591 U.S. at 139–40. But noncitizens "who have established connections in this country [beyond merely entering the United States] have due process rights in deportation proceedings." *Id.* at 107. Merely "set[ting] foot on U.S. soil" is not sufficient to "effect[] an entry" and trigger due-process protections for admissions decisions if a noncitizen is

---

Order of Release after learning of his arrest.

6

detained shortly thereafter. *Id.* at 139–40. But if a noncitizen "gain[s a] foothold in the United states," *Kaplan v. Tod*, 267 U.S. 228, 230 (1925), or "begins to develop … ties" in this country, "his constitutional status changes accordingly," and he "has a right to due process," *Landon v. Plasencia*, 459 U.S. 21, 32–33 (1982); *see also Yamataya v. Fisher*, 189 U.S. 86, 100–01 (1903) (distinguishing noncitizens entitled to due process from those "who ha[ve] been here for too brief a period to have become, in any real sense, a part of our population"). Put another way, "[noncitizens] who have established connections in this country have due process rights in deportation proceedings[.]" *Thuraissigiam*, 591 U.S. at 107.

Mr. Llanes Tellez has clearly "established connections in this country," *id.*, sufficient to make him "a part of our population," *Yamataya*, 189 U.S. at 101. Mr. Llanes Tellez has built a community in Hollister, California, for almost four years, living with community members for whom he helps care while working in agriculture. Mr. Llanes Tellez was not "on the threshold" of entering the country when he was arrested in October. He was instead complying with his obligations to the United States while addressing his work and personal responsibilities and building connections to this country. Mr. Llanes Tellez is therefore entitled to due process under the Fifth Amendment.

The Ninth Circuit has held that a noncitizen's initial detention pursuant to § 1226 generally satisfies due process notwithstanding that the noncitizen has an opportunity to contest the basis for detention only after the noncitizen has already been arrested and detained. *See Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1210–12 (9th Cir. 2022). And under 8 U.S.C. § 1226(b), "The Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien." But the government's decision to release an individual after having detained him creates "an implicit promise" that he will be re-detained only if he violates the conditions of his release. *Morrissey v. Brewer*, 408 U.S. 471 (1972). Such conditional release "is valuable and must be seen as within the protection of the [Due Process Clause]." *Id.* at 482.

Here, after briefly detaining Mr. Llanes Tellez in February 2022, the government released him on his own recognizance subject to certain conditions. Courts in this district consistently hold

that when a noncitizen is released pending civil removal proceedings, the noncitizen has a protected liberty interest in remaining out of immigration custody. *See, e.g.*, *Roa v. Albarran*, No. 25-cv-07802-RS, 2025 WL 2732923, at *5 (N.D. Cal. Sept. 25, 2025); *Ramirez Clavijo v. Kaiser*, No. 25-cv-06248-BLF, 2025 WL 2419263, at *6 (N.D. Cal. Aug. 21, 2025); *Guillermo M. R. v. Kaiser*, No. 25-cv-05436-RFL, 2025 WL 1983677, at *4 (N.D. Cal. July 17, 2025). And while Mr. Llanes Tellez's DUI conviction constituted a technical violation of one of the conditions of his release, the government learned of that conviction no later than February 2025 and did not choose to revoke his release at that time, giving Mr. Llanes Tellez a reasonable expectation that he would not be detained on that basis. If anything, the imposition of the condition requiring substance abuse treatment suggests that the government, after learning of the arrest, concluded that treatment, not detention, was the best response.

Mr. Llanes Tellez's protected liberty interest in remaining out of immigration custody could therefore be taken away only if the government's procedure for doing so accorded with due process. The Supreme Court's test in *Mathews v. Eldridge*, 424 U.S. 319 (1976), establishes three factors that must be balanced in determining what procedures due process requires with respect to the deprivation of a protected interest:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335. Each of these three factors supports the conclusion that Mr. Llanes Tellez was entitled to a hearing before a neutral decisionmaker before he was re-detained.[4]

---

[4] The government notes that neither the Supreme Court nor the Ninth Circuit have squarely held that the *Mathews* test applies to immigration detention. But the Ninth Circuit has "assume[d] without deciding" that it does and applied *Mathews* to bond hearings under 28 U.S.C. § 1226(a). *See Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206–07 (9th Cir. 2022) (citing *Hernandez v. Sessions*, 872 F.3d 976, 993–95 (9th Cir. 2017)). Other circuits have also applied *Mathews* to § 1226(a) proceedings. *See Miranda v. Garland*, 34 F.4th 338, 358–59 (4th Cir. 2022); *Hernandez-Lara v. Lyons*, 10 F.4th 19 (1st Cir. 2021); *Velasco Lopez v. Decker*, 978 F.3d 842,

**I.      Mr. Llanes Tellez's private interest is substantial.**

Mr. Llanes Tellez has a substantial interest in remaining out of custody. The liberty of a noncitizen such as Mr. Llanes Tellez who is released pending removal proceedings, "although indeterminate, includes many of the core values of unqualified liberty[.]" *Morrissey*, 408 U.S. at 482. Subject to the conditions of his release, Mr. Llanes Tellez "can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life." *Id.* The termination of that liberty would "inflict[] a 'grievous loss'" on both petitioner and his loved ones. *Id.*

The United States argues that Mr. Llanes Tellez's re-detention is legal and mandatory under 28 U.S.C. § 1225(b)(2). According to the government, Mr. Llanes Tellez has no more rights under the Due Process Clause than those that are provided to him by statute, and the relevant statute mandates detention. The government's constitutional and statutory arguments both fail.

First, for the reasons noted above, Mr. Llanes Tellez's time and connections in this country preclude accepting any legal fiction that he remains "on the threshold" of entrance into this country. *Thuraissigiam*, 591 U.S. at 139–40. Instead, he possesses a liberty interest in remaining out of detention that is protected by constitutional due process requirements.

Second, and in any event, the government is wrong that Mr. Llanes Tellez is subject to mandatory detention under § 1225(b). As the United States acknowledged at hearing and in its briefing, this Court has already rejected the argument that individuals such as Mr. Llanes Tellez who have established connections to the United States and have been admitted must be detained under Section 1225(b). *See Pablo Sequen*, 2025 WL 2935630, at *8–*10; Return at 3.

Section 1225 defines a noncitizen "who 'arrives in the United States,' or 'is present' in this country but 'has not been admitted,' … as 'an applicant for admission." *Jennings v. Rodriguez*, 583 U.S .281, 287 (2018) (quoting 8 U.S.C. § 1225(a)(1)). Section 1225(b)(2)(A) provides that,

---

851 (2d Cir. 2020). The Ninth Circuit has also applied *Mathews* when considering due-process challenges to removal proceedings. *See, e.g.*, *Cruz Pleitez v. Barr*, 938 F.3d 1141, 1145–46 (9th Cir. 2019); *Flores-Chavez v. Ashcroft*, 362 F.3d 1150, 1160–61 (9th Cir. 2004); *Martinez-de Bojorquez v. Ashcroft*, 365 F.3d 800, 805 (9th Cir. 2004). The Court will accordingly apply *Mathews* here.

9

"in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." In the government's view, every "applicant for admission" is necessarily "seeking admission" and therefore subject to mandatory detention.

There are numerous problems with the government's interpretation of § 1225(b)(2). If every applicant for admission was necessarily a noncitizen "seeking admission," as the government suggests, then the phrase "an alien seeking admission" in § 1225(b)(2) would have no meaning—it would instead read simply "the alien." *See Pablo Sequen*, 2025 WL 2935630, at *9. Further, the statute's use of "seeking admission" "implies some sort of present-tense action." *Martinez v. Hyde*, 2025 WL 2084238, at *6 (D. Mass. July 24, 2025); *see also Al Otro Lado v. Wolf*, 952 F.3d 999, 1011 (9th Cir. 2020) ("The use of the present progressive, like use of the present participle, denotes an ongoing process.").

The government's own regulations implementing § 1225(b)(2) confirm that § 1225(b)(2) refers to the class of noncitizens subject to mandatory detention by referring to them as "arriving alien[s]." *See* 8 C.F.R. § 235.3(c)(1); *see also Martinez*, 2025 WL 2084238, at *6. Other implementing regulations define "arriving alien" as, in relevant part, "an applicant for admission *coming or attempting to come into the United States at a port-of-entry*." 8 C.F.R. § 1.2 (emphasis added). Both the text of § 1225(b)(2) and the relevant regulations, then, indicate that § 1225(b)(2) applies only to applicants for admission who are actively "seeking admission" by requesting entry into the United States upon arrival. That category does not include Mr. Llanes Tellez.

The use of the word "otherwise" in § 1225(a)(3) does not indicate that those who are "applicant[s] for admission" are a subset of those who are "seeking admission." Section 1225(a)(3) says, "All aliens … who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers." 8 U.S.C. § 1225(a)(3). The government has previously taken the position that "or otherwise" in § 1225(a)(3) suggests that the preceding phrase (i.e. "applicants for admission") is entirely subsumed by the phrase that follows (i.e. noncitizens "seeking admission or readmission to or

10

transit through the United States"). But the government's position would misread "otherwise." "Otherwise" generally means, "in a different way or manner" or "in different circumstances." *Otherwise*, Webster's Ninth New Collegiate Dictionary 835 (1984). So § 1225(a)(3)'s use of "or otherwise" simply means that immigration officers must inspect any noncitizen who is "seeking admission or readmission to or transit through the United States," whether the noncitizen is an applicant for admission *or* differently situated. To be sure, § 1225(a)(3) acknowledges some overlap between the categories of "applicants for admission" and noncitizens "seeking admission," with the latter serving as "a 'catch-all' to describe non-citizens who *must be inspected*." *Cordero Pelico v. Kaiser*, 2025 WL 2822876, at 14 (N.D. Cal. Oct. 3, 2025) (*quoting Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1119 (9th Cir. 2025)). But that does not suggest that either category totally subsumes the other. There may be noncitizens "seeking admission" who are not applicants for admission. "For example, those applying for a visa at a consulate abroad would be seeking admission but not be applicants for admission, since they are neither present in the country nor arriving in it." *Id.* (citing *Matter of Lemus-Losa*, 25 I. & N. Dec. 734, 741 (BIA 2012)). And there are noncitizens such as Mr. Llanes Tellez who are applicants for admission but are not currently "seeking admission" because they have already been released into the United States.

The government's interpretation of § 1225(b)(2) is also in significant tension with other portions of the INA. Section 1225(b)(2) requires detention of noncitizens who cannot prove to an immigration officer that they are "clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A). Yet § 1226(c) separately requires detention for noncitizens who are "inadmissible" on specific grounds. A noncitizen who is "inadmissible" for one of the specific grounds laid out in § 1226(c) would by necessity be unable to make the clear showing of admissibility required to avoid detention under § 1225(b)(2). So interpreting § 1225(b)(2) to cover every "applicant for admission," including noncitizens subject to § 1226, would largely nullify § 1226(c).

Perhaps most significantly, interpreting § 1225(b)(2) to encompass all "applicants for admission" would have the effect of nullifying including a subsection in § 1226 added by

11

1  Congress just this year. That subsection was amended by the Laken Riley Act, Pub. L. No. 119-1,
2  § 2, 139 Stat. 3, 3 (2025) (adding 8 U.S.C. § 1226(c)(1)(E)), which added a specific ground on
3  which the government must detain a noncitizen. The additional specific ground "includes
4  noncitizens who are (1) inadmissible under 1182(6)(A) [present without admission or parole],
5  (6)(C) [misrepresentation], or (7)(A) [lack of proper documentation] *and* (2) have been charged
6  with one of certain enumerated crimes." *Salcedo Aceros v. Kaiser*, 2025 WL 2637503, at *10
7  (N.D. Cal. Sept. 12, 2025). But according to the government's logic, the noncitizens charged with
8  one of the enumerated crimes whose detention Congress mandated in the Laken Riley Act were
9  already subject to mandatory detention under § 1225(b)(2) whether or not they had been so
10 charged. The Court declines to adopt an interpretation of § 1225(b)(2) that would almost entirely
11 negate another provision of the same statutory scheme enacted just this year. *See Marx v. Gen.*
12 *Revenue Corp.*, 568 U.S. 371, 386 (2013); *In re Saldana*, 122 F.4th 333, 341 (9th Cir. 2024)
13 ("When Congress substantively revises a statute's text, 'we presume it intends its amendment to
14 have real and substantial effect.'" (quoting *Stone v. INS*, 514 U.S. 386, 397 (1995))).
15       In its return, the government relies on a recent BIA decision, *Matter of Yajure Hurtado*, 29
16 I. & N. Dec. 216 (BIA 2025), to argue that "based on the plain language of § 1225(b)(2),
17 immigration judges lack authority to hear bond requests or to grant bonds to aliens who are
18 present in the United States without admission." Return at 3. In *Matter of Yajure Hurtado*, the BIA
19 held that a noncitizen who is an "applicant for admission" is necessarily "seeking admission" such
20 that § 1225(b)(2) covers all "applicants for admission," including those who have been released
21 into and resided in the United States for several years. *See Matter of Yajure Hurtado*, 29 I. & N.
22 Dec. at 221–25. Because "agencies have no special competence in resolving statutory
23 ambiguities," "the BIA decision is entitled to little deference." *Salcedo Aceros*, 2025 WL
24 2637503, at *9 (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024)). Instead,
25 the BIA's interpretation is owed deference only to the extent that "the validity of its reasoning"
26 and "its consistency with earlier and later pronouncements" give it "power to persuade." *Skidmore*
27 *v. Swift & Co.*, 323 U.S. 134, 140 (1944).
28       The BIA's reasoning fails to persuade because, as explained above, its interpretation of

§ 1225(b)(2) needlessly renders the phrase "seeking admission" superfluous, vitiates the discretionary-detention regime created by § 1226(a), and nullifies much of § 1226(c), including Congress's most recent amendments thereto. Any persuasive power the BIA's decision might have is further undercut by its inconsistency with the BIA's earlier pronouncements:

> Prior to its September 5 decision [in *Yajure Hurtado*], the BIA issued three non-precedential decisions taking the *opposite* position. In one decision, the Board even stated that it was "unaware of any precedent" that would support the Government's position. Under *Loper*, the Court has no obligation to defer to the BIA's view, particularly when that view has not "remained consistent over time."

*Salcedo Aceros*, 2025 WL 2637503, at *9 (citations omitted) (first citing *Martinez*, 2025 WL 2084238, at *8; then quoting *Loper Bright*, 603 U.S. at 386).

Accordingly, Mr. Llanes Tellez is not subject to § 1225(b)(2), and is instead subject to the discretionary-detention framework of § 1226(a), which permits detention only of noncitizens who pose a danger to other persons or property or are unlikely to appear for schedule removal proceedings." *See* 8 U.S.C. § 1226(a)(4).

In the alternative, the United States argues that Mr. Llanes Tellez's detention was authorized under 28 U.S.C. § 1226(b) because of his 2023 DUI conviction. Return at 3-4. Under Section 1226(b), "[t]he Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien." The United States argues that "Petitioner's DUI arrest and conviction are precisely the sort of material change in circumstances that trigger DHS's rearrest authority under § 1226(b)." Return at 4.

While the United States is correct that § 1226(b) authorizes revoking parole granted under § 1226(a), the Fifth Amendment's Due Process Clause also governs the United States's treatment of noncitizens like Mr. Llanes Tellez. *See Zadvydas*, 533 U.S. at 690; *Reno v. Flores*, 507 U.S. 292, 306 (1993). Mr. Llanes Tellez has cognizable liberty interests under the Due Process Clause, regardless of the statutory authorization for detention provided by § 1226(b), and those interests are not eliminated by the mere fact that Mr. Llanes Tellez violated one condition of his release. Indeed, that the government learned of Mr. Llanes Tellez's DUI arrest by no later than February 2025 but chose not to detain him until October 2025, nearly eight months later, provided him with

13

a reasonable expectation that he would remain at liberty notwithstanding that violation.

For these reasons, Mr. Llanes Tellez's private interest in avoiding a deprivation of liberty is high, and the first *Mathews* factor strongly favors him.

## II. The risk of erroneous deprivation and value of additional safeguards are high.

In civil immigration proceedings, the government may generally only detain people for two reasons: to prevent flight prior to removal or protect against a danger to the community. *See Zadvydas*, 533 U.S. at 690.[5] In evaluating what procedures due process requires in connection with Mr. Llanes Tellez's detention, then, the question under the second *Mathews* factor is whether there is a significant risk that Mr. Llanes Tellez is being detained without a valid purpose and whether additional safeguards would help prevent such an erroneous deprivation of his liberty.

As to the risk that Mr. Llanes Tellez is being erroneously detained without a valid purpose, the record before the Court does not suggest that Mr. Llanes Tellez poses any risk of flight or threat to the community. Mr. Llanes Tellez has attended his scheduled meetings with DHS since his entry into the country and has significant community ties in California that indicate a lack of flight risk. Indeed, the government has offered no argument or evidence suggesting he poses such a risk. The government also provides little evidence that Mr. Llanes Tellez poses any risk to the community. To be certain, Mr. Llanes Tellez's was arrested and convicted of a DUI. But the events underlying the conviction occurred more than two years ago, in December 2023; the evidence before the Court suggests that the incident was aberrant and inconsistent with Mr. Llanes Tellez's conduct before or after the arrest; and Mr. Llanes Tellez has since undergone treatment and maintained a clean record of compliance. The December 2023 arrest thus provides scant evidence as to the kind of threat Mr. Llanes Tellez might pose at this point two years later. Indeed, it is undisputed that the United States learned of Mr. Llanes Tellez's arrest and conviction by no later than February 17, 2025 and interacted with Mr. Llanes Tellez on April 17, 2025 but waited until October 2025—approximately eight months later—before determining that his re-detention

---

[5] The government has not suggested that Mr. Llanes Tellez's removal is imminent, such that his detention might be justified a necessary and short-term step in its effectuation of that removal.

14

was necessary. *See* Dkt. 10 ¶ 7.

Under these circumstances, a pre-deprivation hearing before a neutral decisionmaker would have significant value in determining whether he poses a threat to the public. Such a hearing would enable the decisionmaker to understand precisely what Mr. Llanes Tellez did, whether it was aberrant or unreflective of his typical behavior, and how he has conducted himself since that time, including whether he completed substance abuse counseling and what that counseling entailed. *See, e.g.*, Dkt. 6-1, Exh. A; Dkt. 6 ¶ 3 (indicating that petitioner completed DUI counseling in 2024). The second *Mathews* factor thus also strongly favors Mr. Llanes Tellez.

### III. The government's countervailing interest in detaining Mr. Llanes Tellez without a pre-deprivation hearing is minimal.

The government's countervailing interest in detaining Mr. Llanes Tellez without a pre-deprivation hearing is minimal. For the reasons noted above, the government's interest in preventing Mr. Llanes Tellez's flight before any hearing could be provided was minimal, and the government has not demonstrated that there was a significant risk to the public if he were to have remained at liberty pending such a hearing. That the United States waited at least eight months to arrest him after learning of his conviction suggests that the government itself did not previously believe that he posed such a threat to public safety that he had to be detained without any pre-detention opportunity to be heard. Finally, the costs of providing a pre-deprivation bond hearing to Mr. Llanes Tellez would likely have been minimal. *Singh v. Andrews*, 2025 WL 1918679, at *8 (E.D. Cal. July 11, 2025) ("In immigration court, custody hearings are routine and impose a minimal cost." (internal quotation marks omitted)).

Accordingly, the government's countervailing interest in detaining Mr. Llanes Tellez prior to providing him with a hearing to determine whether his detention was justified was minimal. The third *Mathews* factor thus likewise favors Mr. Llanes Tellez.

\*   \*   \*

In short, all three *Mathews* factors favor Mr. Llanes Tellez. Considering the substantial private interest at stake, the risk of erroneous deprivation through the procedures used, and the government's minimal interests in not providing additional process, the Due Process Clause

required the government to provide Mr. Llanes Tellez with notice and an opportunity to be heard before a neutral decisionmaker before he was detained and deprived of his liberty. Because he was not provided with that hearing, he is being detained in violation of the United States Constitution. A writ of habeas corpus requiring his immediate release must therefore issue.

If the government wishes to re-detain Mr. Llanes Tellez, it must provide him with the pre-detention hearing before a neutral decisionmaker required by due process. Mr. Llanes Tellez may be detained only if the government proves by clear and convincing evidence at such a hearing that he is a flight risk or danger to the public. *See Singh v. Holder*, 638 F.3d 1196, 1203–04 (9th Cir. 2011).[6]

## CONCLUSION

For the foregoing reasons, the Court grants Mr. Llanes Tellez's petition for writ of habeas corpus.[7] The government must immediately release Mr. Llanes Tellez from detention and may not re-detain Mr. Llanes Tellez without providing him with a pre-detention bond hearing before a neutral decisionmaker at which the government establishes by clear and convincing evidence that his detention is necessary to protect the community from danger or to mitigate a risk of flight, and

---

[6] The Ninth Circuit's intervening decision in *Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022), does not change the applicable burden of proof. *Rodriguez Diaz* rejected a habeas petitioner's argument that he was entitled to a second bond hearing after a lengthy period of detention because the government had not had the burden of proof at his initial bond hearing pursuant to § 1226(a). The Ninth Circuit concluded that the Fifth Amendment did not require the government to prove a valid basis for detention by clear and convincing evidence at the initial hearing because the statutory framework provided the petitioner with "extensive procedural protections" in other respects, "including several layers of review of the agency's initial custody determination, … the opportunity to be represented by counsel and to present evidence, the right to appeal, and the right to seek a new hearing when circumstances materially change." *Id.* at 1210–12. *Rodriguez Diaz* addressed circumstances entirely different from those presented here, in which petitioner lacks the procedural protections available following a denial of release under § 1226(a) and faces a high risk that he is being erroneously deprived of his liberty. Indeed, *Rodriguez Diaz* recognized that greater protections may be constitutionally necessary in individual cases where the risk of erroneous deprivation of liberty is particularly high. *See id.* at 1212–13. The constitutional principles announced in *Singh*, not those considered in *Rodriguez Diaz*, apply here.

[7] Because the government's detention of Mr. Llanes Tellez in violation of his procedural due process rights is dispositive, the Court need not address whether it also violated his substantive due process rights. If he is provided with the hearing required by procedural due process and re-detained, he may of course raise that theory in a new habeas petition or by seeking to reopen this proceeding.

16

that no conditions other than re-detention are sufficient to prevent such harms.

**IT IS SO ORDERED.**

Dated: December 18, 2025

_____
P. Casey Pitts
United States District Judge